KEITH R.,                        )
                                 )
        Plaintiff,               )
                                 )
        v.                       )    Case No. 2:17-cv-226
                                 )
ANDREW SAUL,                     )
Commissioner of the Social       )
Security Administration          )
                                 )
        Defendant.               )

**OPINION AND ORDER**

Plaintiff Keith R. brings this action pursuant to 42 U.S.C. § 405(g) for review of the Commissioner's determination that he is not disabled and not entitled to disability insurance benefits (DIB).  Now before the Court are Plaintiff's motion for judgment reversing the decision of the Commissioner, and the Commissioner's motion for judgment affirming that decision.  For the reasons set forth below, Plaintiff's motion is **granted**, the Commissioner's motion is **denied**, and the case is **remanded** for further proceedings.

**Factual Background**

**I.  Procedural History**

Mr. R. filed an application for DIB on December 28, 2015, alleging disability as of December 14, 2013.  His application was denied initially and upon reconsideration, and he requested an administrative hearing.  The hearing was held on May 9, 2017 before Administrative Law Judge (ALJ) Joshua Menard.  Mr. R. was

represented by counsel and provided testimony by video from
Burlington, Vermont.  The ALJ was in Manchester, New Hampshire.
A Vocational Expert (VE) and medical expert also testified.

The ALJ issued a written decision on June 6, 2017,
concluding that Mr. R. was not disabled within the meaning of the
Social Security Act.  Mr. R. requested review by the Appeals
Council, and that request was denied.  He subsequently filed this
action.

## II.  Personal and Medical History

Mr. R. was born in 1963 and served in the United States Army
for over 30 years, including active duty between 2006 and 2013.
He worked for IBM from 1984 through 1999, and for Bombardier for
several years.  During his service in the Army, Mr. R. piloted
Blackhawk helicopters.  In 2013 he was in a helicopter crash in
Baghdad, sustaining injuries to his head and cervical spine.

After his deployment, Mr. R. worked for the National Guard
full-time as an Operations Officer and Standardization Pilot.  He
was honorably discharged in 2014, and has since been diagnosed
with traumatic brain injury (TBI) and post-traumatic stress
disorder (PTSD).  Mr. R. testified that he is currently
considered permanently and totally disabled by the Veterans
Administration.     In May 2013, Mr. R. was screened by Carlos G.
Tun, M.D. for possible TBI and polytrauma.  Dr. Tun concluded
that Mr. R.'s reported history of injuries and symptoms were

consistent with TBI.  Dr. Tun recommended medication for Mr. R.'s ongoing headaches, physical therapy for balance issues, and mental health treatment.

On June 25, 2013, Mr. R. underwent C5-6 anterior cervical discectomy, interbody fusion and anterior metallic plate and screw fixation surgery with orthopedic surgeon Robert D. Monsey, M.D.  In December 2013, after his condition failed to improve, Mr. R. had a second surgery involving C5-6 anterior hardware removal, discectomy at C4-5, and fusion with allograft and plate. Mr. R. has been prescribed hydromorphone and tramadol for pain, and has been provided treatment injections.  His pain management is overseen by general practitioner Whitney Calkins, M.D.

When Mr. R. continued to report neck and arm pain after his second surgery, he received additional physical therapy and hydromorphone (Dilauded) for pain.  Other medicines prescribed by Dr. Calkins included Ambien and Viibryd.  In August 2014, Mr. R. reported to Dr. Calkins that his average pain level was a six out of ten without medication, and a three out of ten with medication.  In October 2014, he reported that his average pain level was four out of ten.

In May 2015, Mr. R. informed Dr. Monsey of the Spine Institute that he was continuing to have pain in his neck similar to the pain he experienced prior to his two surgeries.  Dr. Monsey concluded that Mr. R.'s pain level was unlikely to

improve.  As of October 2015, Mr. R. was suffering from bilateral trochanteric bursitis.  In July 2016, he was treated with injections.

Between January 2014 and December 2015, Mr. R. owned and operated a restaurant.  The restaurant had 26 employees.  Mr. R. continued to take two tramadol and two Dilaudid during the workday.  He complained to his physician that he could not carry trays of dishes, and that his hands cramped when he drove.  Mr. R. sold the business at the end of 2015.

Mental health notes from November 2015 indicate that Mr. R. was experiencing intermittent panic triggered by concerns about finances and the sale of the restaurant.  During the following year he attended several counseling sessions.  By March 2016, Mr. Mr. R.'s treating psychologist, Laura Gibson, Ph.D., noted that Mr. R. had improved energy, concentration, mood and sleep.

In February 2016, Disability Determination Services psychologist Edward Hurley, Ph.D., reviewed Mr. R.'s records and concluded that he retained the concentration, persistence, and pace to perform two to four-step tasks for two hours over an eight hour period.  Dr. Hurley also concluded that Mr. R. was moderately limited in his ability to complete a work day.

On March 29, 2016, Mr. R. was examined by Alan Lilly, M.D. Mr. R. informed Dr. Lilly that prior to his two surgeries he had been suffering from neck pain and pain both shoulders, with pain

radiating down his arms and into his fingers.  These issues resulted in weakness of his upper extremities and into his hands. Mr. R. reported that the surgeries had not provided significant relief, and that he was unable to engage in household activities such as using a hammer, or recreational pursuits such as golf or skiing.  Even driving was at times problematic.  Mr. R. also reported leg pain, resulting in difficulty walking more than one block before feeling fatigued.  Dr. Lilly observed that at times when describing his problems, Mr. R. became weepy.

Dr. Lilly's physical examination revealed mild weakness in Mr. R.'s upper extremities, weakness in the fingers, and mild weakness in grip strength bilaterally.  Mr. R. had difficulty getting his arms above 90 degrees.  His lower extremities, aside from mild trochanteric bursitis, where within normal limits.  His gait was also within normal limits, and he was able to stand up out of a chair without evidence of weakness.  Mr. R. emphasized to Dr. Lilly the psychological effects of the helicopter crash, and noted that therapy had been very helpful.

In May 2016, Mr. R. suffered four seizures.  There is no record evidence of a diagnosis or treatment for the seizures.

In December 2016, Mr. R. reported having worked for UPS for three weeks loading trucks.  He felt that the work exacerbated his PTSD symptoms.

In February 2017, psychologist Pamela Guiduli Nash, Psy. D.,

met with Mr. R. at her office.  Dr. Nash noticed that Mr. R. was hyper vigilant, as upon entering her office he paid special attention to the available exits and made note of things outside the window.  When a garbage truck outside the office made a loud noise, Mr. R. flushed in the face, clenched his hands, and winced in apparent pain.  When questioned about his life, he again clenched his fists and pushed them into the sofa.  At some points in the meeting Mr. R. appeared to be trying to control rage, while at other times he cried.  Eye contact with Dr. Nash was intermittent.  Dr. Nash found that Mr. R.'s answers were occasionally resistant or defensive, and that his thought process was extremely negative.  Dr. Nash also conducted on objective test, the Folstein Mini Mental Status Exam (MMSE).  Mr. R.'s performance on the test indicated that he could not perform memory tasks.

Dr. Nash concluded that a diagnosis of TBI would be appropriate, and that Mr. R. exhibited almost all of the symptoms of PTSD.  In her written report, she stated that Mr. R. had one of the worst cases of PTSD she had ever seen.  She also found that Mr. R. had significant functional impairment socially, occupationally, and emotionally.  Dr. Nash opined that, in addition to PTSD, Mr. R. fit the full diagnosis for Major Depressive Disorder, and that he also suffered from Adjustment Disorder, With Anxiety.  She found no evidence of substance

abuse.

Dr. Nash concluded that depending upon the environment, Mr. R. could have difficulty focusing, and that pain issues combined with PTSD could impair his ability to make judgments. Mr. R.'s significant irritability led Dr. Nash to conclude that he would have trouble interacting with others on a sustained basis. She further suggested assigning a payee to help Mr. R. manage his finances.

In January 2017, treating psychologist Dr. Gibson wrote a letter summarizing her opinions of Mr. R.. Dr. Gibson provided therapy beginning in February 2013, and had met with Mr. R. over 70 times since then. In treatment with Dr. Gibson, Mr. R. had spoken about his professional experiences, including those as a restaurant owner. He informed Dr. Gibson that he found the ownership experience overwhelming, and had made errors such as firing his best waitress and mismanaging finances. Mr. R. also had trouble with simple tasks such as operating the cash register, despite years of computer experience.

Dr. Gibson's letter noted that Mr. R. was continuing to experience significant levels of anxiety and PTSD despite almost three years of focused treatment. In Dr. Gibson's clinical opinion, it was more likely than not that Mr. R.'s mental health symptoms would interfere with his ability to work in the foreseeable future due to interference with attention,

concentration, interpersonal relationships, and ability to cope effectively with stress.

Mr. R. maintains contact with his ex-wife, with whom he shared custody of their two children since the couple's divorce in 2005.  He also maintains contact with his mother and brothers.

## III. Hearing Testimony

### A. **Mr. R.'s Testimony**

At the hearing on May 9, 2017, Mr. R. explained that he began flying helicopters in 1982, and was an instructor pilot for approximately 25 years.  He deployed overseas three times and saw heavy combat.  He attributes his PTSD, at least in part, to his experiences in combat as a med-evac pilot.  Mr. R. has not flown a helicopter since late 2013.

Mr. R. testified that has trouble concentrating, and with performing simple tasks such as paying bills or following the plot of a movie.  Sometimes he is startled by sounds, particularly those that resemble an explosion or gunshot.  He reportedly suffers from permanent, untreatable tinnitus as a result of his time in helicopters and in combat.

Mr. R. described himself as super vigilant, meaning that he tenses up and becomes acutely aware of his surroundings.  While he used to engage in social activities, he has lost interest in being social.  He has very few friends, and finds it difficult to be around people.  He sometimes suffers from panic attacks as a

result of being in public or stressful situations. Mr. R. also testified that since the helicopter accident, in which he suffered nerve damage, he has had trouble executing motor skills with his hands.

Although he owned a restaurant, he describes himself as having been a glorified host. The restaurant had accountants, two chefs, and a general manager to guide daily operations. Mr. R. testified that his role included signing checks, and that he did his best to ensure that things were operating properly. However, it was the general manager who was responsible for day to day operations and personnel management. While owning the restaurant, Mr. R. was reportedly irritable with his employees, possibly because of his PTSD. He testified that medication currently helps him control his anger, but only somewhat. Mr. R. sold the restaurant because it was not financially successful and because he found ownership overwhelming.

Mr. R. explained that as a result of his TBI, he experiences periodic and debilitating headaches. As a result of his two neck surgeries, he suffers pain down both arms and numbness and tingling in the tips of his fingers. Simple motor skills such as buttoning a shirt are very difficult, and he drops things frequently. He also suffers from pain when he moves his head, with a pain level between seven and eight out of ten. The VA has provided him with medication for pain, but the medication makes

him extremely drowsy.

Mr. R. has applied for work in both the public and private sectors.  He was offered a job as a baggage handler, but did not accept it because he thought he was applying to be a ticket handler.  He also applied to be a project manager with the State of Vermont Department of Safety, but was not offered the job.

### B. The Vocational Expert's Testimony

A Vocational Expert testified at the hearing.  The ALJ asked the VE to consider a hypothetical person of Mr. R.'s age, education level, and job history.  That person would be limited to occasional overhead reaching, occasional ability to use ladders and scaffolds, occasional ability to crawl, and the ability to handle things frequently with both left and right hands.  With respect to environmental limitations, the ALJ asked the VE to assume a moderate noise limitation or quiet noise environment only.  As to psychological limitations, the hypothetical worker would have no more than occasional interaction with coworkers and the general public.

Based upon this hypothetical, the VE concluded that the individual could not perform any of Mr. R.'s past work.  With respect to other available work, the VE concluded that the individual could perform light cleaning, work as a collator operator at a light level, and as a mail sorter at a light level. When Mr. R.'s attorney asked the VE to assume that the worker

10

could only occasionally use his right and left hands because of numbness and tingling in the fingertips, the VE testified that none of the three jobs (cleaning, collator operator, and mail sorter) could be performed.

The ALJ also asked the VE to consider an individual who must be off task at least 15% of the day with issues of chronic pain. The VE testified that no jobs could be sustained with that level of off-task behavior on a regular basis. When the ALJ removed the 15% off-task limitation and replaced it with two missed days of work each month, again due to issues of chronic pain, the VE testified that such a rate of absenteeism would not be tolerated. When the ALJ proposed a hypothetical based on a less than sedentary exertional level generally defined as the inability to complete an eight hour work day, the VE confirmed that in such a situation there would be no available competitive work.

### C.    Dr. Strahl's Testimony

Psychiatrist Nathan Strahl, M.D., Ph.D., testified as a medical expert. Dr. Strahl had reviewed Mr. R.'s medical records and found four primary diagnoses related to mental impairments: depressive disorder, PTSD, generalized anxiety disorder, and substance abuse of alcohol and marijuana. Dr. Strahl testified that Mr. R. is capable of simple, routine, and repetitive tasks. He based his opinion in part on Mr. R.'s management and sale of the restaurant in 2014 and 2015. That experience, Dr. Strahl

opined, suggested an ability to also handle complex or detailed tasks. Dr. Strahl further opined that Mr. R. could work adequately with supervisors and could tolerate limited to occasional interaction with coworkers. Because Mr. R. startles easily, Dr. Strahl concluded that he would need a quiet work environment.

## IV. The ALJ's Decision

The ALJ used a five-step sequential process to evaluate Mr. R.'s disability claim. *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity

(RFC), which means the most the claimant can still do despite his
or her mental and physical limitations based on all the relevant
medical and other evidence in the record. 20 C.F.R. §§
404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). The
fourth step requires the ALJ to consider whether the claimant's
RFC precludes the performance of his or her past relevant work.
20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth
step, the ALJ determines whether the claimant can do "any other
work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears
the burden of proving his or her case at steps one through four,
*Butts*, 388 F.3d at 383; and at step five, there is a "limited
burden shift to the Commissioner" to "show that there is work in
the national economy that the claimant can do," *Poupore v.
Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the
burden shift to the Commissioner at step five is limited, and the
Commissioner "need not provide additional evidence of the
claimant's [RFC]").

In this case, the ALJ first determined that Mr. R. has
worked since his alleged disability date of December 2013, but
that his work activity did not rise to the level of substantial
gainful activity. At step two, the ALJ found the following
severe impairments: degenerative disc disease; spine disorder;
PTSD; depression; anxiety; and substance abuse. The ALJ found
that Mr. R.'s TBI was a non-severe impairment, but considered the

13

TBI symptoms when determining Residual Functioning Capacity (RFC). At step three, the ALJ found that none of Mr. R.'s impairments, alone or in combination, met or medically equaled a listed impairment.

The ALJ based this conclusion in large part upon the opinions of the testifying medical expert, Dr. Strahl. The ALJ also gave great weight to the opinions of Dr. Lilly. The ALJ gave Dr. Nash's opinion limited weight, finding no indication that she had reviewed Mr. R.'s medical records. He also gave little weight to the opinion of Mr. R.'s treating psychologist, Dr. Gibson.

Next, the ALJ determined that Mr. R. had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), except that he could only lift and/or carry and push/pull ten pounds frequently and 20 pounds occasionally; sit for up to six hours in an eight-hour workday; and stand and/or walk up to six hours in an eight-hour workday. The ALJ further found that Mr. R. can occasionally reach overhead bilaterally, and can handle items frequently in his left and right hands. The ALJ concluded that Mr. R. can occasionally climb ladders, ropes, or scaffolds; can crawl; can be exposed to a moderate to quiet noise environment; and can occasionally interact with the public and co-workers.

Given this RFC, the ALJ found that Mr. R. could not perform his past relevant work as a helicopter pilot. Based upon the

testimony of the VE, the ALJ also found that Mr. R. could perform

jobs such as light cleaning, light collator operator, and light

mail sorter, and was therefore not disabled.

## Standard of Review

The Social Security Act defines the term "disability" as the

"inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not

less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will

be found disabled only if it is determined that her "impairments

are of such severity that [s]he is not only unable to do [her]

previous work[,] but cannot, considering [her] age, education,

and work experience, engage in any other kind of substantial

gainful work which exists in the national economy." 42 U.S.C. §

423(d)(2)(A).

In considering a Commissioner's disability decision, the

court "review[s] the administrative record *de novo* to determine

whether there is substantial evidence supporting the . . .

decision and whether the Commissioner applied the correct legal

standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002)

(citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42

U.S.C. § 405(g). In its deliberations, a court should bear in

mind that the Social Security Act is "a remedial statute to be

broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## **Discussion**

The ALJ relied almost exclusively upon the conclusions of non-examining expert Dr. Strahl. Mr. R. submits that such reliance upon Dr. Strahl was misplaced as his conclusions were inconsistent with other medical professionals, both treating and non-treating. Mr. R. also notes that Dr. Strahl based his opinion upon Mr. R.'s ownership of a restaurant, notwithstanding Mr. R.'s inability to manage the restaurant effectively or profitably. Finally, Mr. R. submits that Dr. Strahl mischaracterized Dr. Nash's opinions. The Court generally agrees with each of these three points, and finds that substantial evidence does not support the ALJ's conclusions.

Dr. Strahl's opinions, based solely upon a review of medical records, were not consistent with providers who either met with or treated Mr. R. in the years prior to the hearing. For example, Dr. Gibson was Mr. R.'s treating psychologist for three years. Dr. Gibson opined, based upon over 70 meetings with Mr. R., that Mr. R. was unlikely to be able to work given his significant levels of anxiety and PTSD.[1] The ALJ gave the

---

[1] Although not specifically raised in the briefing, the Court notes the possible application of the "treating physician rule" to Dr. Gibson's opinion. A "treating" physician is a claimant's "own physician, psychologist, or other acceptable medical source who provides [a claimant] . . . with medical

opinion of Dr. Gibson little weight.

The ALJ downgraded the impact of Dr. Gibson's opinions because (1) there was no indication that she had reviewed the entire medical record as of the hearing date, and (2) she did not account for Mr. R.'s ownership of a restaurant. Given Dr. Gibson's lengthy clinical relationship with Mr. R., her failure to review a few months of medical records should not have factored so significantly. And as discussed above, Mr. R.'s experience with restaurant ownership was overwhelming and largely a failure. He explained to Dr. Gibson during therapy sessions that he had mismanaged the business's finances, had fired his best waitress, and was unable to learn how to use the cash register despite years of computer experience. In his testimony

---

treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Brickhouse v. Astrue*, 331 F. App'x. 875, 877 (2d Cir. 2009) (citing C.F.R. § 404.1502). Social Security Association regulations give the opinions of treating physicians "controlling weight" so long as those opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in . . . [the] record." 20 C.F.R. § 416.927(c)(2); *see also Lesterhuis v. Colvin*, 805 F.3d 83, 88 (2d Cir. 2015). "Even if the treating physician's opinion is contradicted by other substantial evidence, and so is not controlling, it may still be entitled to significant weight 'because the treating source is inherently more familiar with a claimant's medical condition than are other sources.'" *Tankisi v. Comm'r of Social Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) (quoting *Schisler v. Bowen*, 851 F.2d 43, 47 (2d Cir. 1988)). The Court highlights the treating physician rule so that upon remand the rule, specifically with respect to Dr. Gibson, can be fully considered.

before the ALJ, Mr. R. explained that he was sometimes volatile with his employees and was essentially a glorified host.

The ALJ failed to properly address Dr. Gibson's treatment relationship with Mr. R., the fact that her opinions were consistent with those of Dr. Nash, or her expertise as a psychologist. When compared to a review of documents by Dr. Strahl, Dr. Gibson's ongoing relationship with Mr. R. was more likely to generate an accurate understanding of Mr. R.'s capabilities. There is no dispute as to Dr. Gibson's professional qualifications, and the Court finds that the ALJ failed to give her opinions appropriate weight.

The ALJ also failed to give Dr. Nash's opinions appropriate weight. The ALJ discounted those opinions in part because Dr. Nash only met with Mr. R. once. However, as Mr. R. notes in his briefing, the ALJ postponed the original hearing date so that Dr. Nash could conduct a consultative examination. If the ALJ felt that the consultation was sufficiently significant to warrant a delay, his subsequent discounting of Dr. Nash's report on the basis of that single consultation was, at best, inconsistent.

The ALJ also criticized Dr. Nash's opinions as based largely upon Mr. R.'s subjective complaints. Dr. Nash's report, however, included observations of Mr. R.'s mannerisms, including hyper vigilance, that were separate from his personal narrative. Dr. Nash also administered the MMSE exam, which indicated an

inability to complete memory-related tasks.

Dr. Strahl's conclusions, including his finding that Mr. R. could likely perform detailed and complex tasks due to his ownership of a restaurant, are largely unsupported. Mr. R.'s tenure as a restaurant owner was not successful, as Mr. R. was unable to manage not only the complexities of financial and personnel management, but also the simpler tasks of operating the cash register or carrying trays.

In addition to clear mental health issues, Mr. R. is physically impaired. Dr. Lilly, whose opinions the ALJ gave significant weight, found mild weakness in Mr. R.'s upper extremities, weakness in his fingers, and mild weakness in his grip strength in both hands. Mr. R. has consistently reported numbness and tingling his hands and fingers, as well as difficulty holding or manipulating objects with his hands since his helicopter crash. Mr. R. continues to suffer from pain in his neck and shoulders, and while pain medication is helpful in reducing but not eliminating that pain, the medication also makes him drowsy.

Despite these impairments, both mental and physical, the ALJ asked the VE to imagine an individual who could occasionally reach over his head, handle things frequently with both his left and right hands, tolerate an environment with only a moderate noise limitation, and interact with coworkers and the general

public on occasion.  When it was suggested to the VE that the hypothetical person would be off task 15% of the day because of chronic pain, or might miss two days of work each month, the VE testified that no work would be available.  Mr. R.'s medical records plainly support a finding of such chronic pain.  The VE also opined that if that person could only occasionally use his hands because of numbness and tingling in the fingertips, none of the identified jobs could be performed.  Numbness, tingling, and weakness are also plainly supported by the record.

Mr. R.'s final argument is that there is an inconsistency between the VE's testimony and the job definitions set forth in the Dictionary of Occupational Titles (DOT).  Mr. R. submits that while the VE listed three possible occupations, the DOT states that each such occupation requires frequent reaching.  The hypothetical presented to the VE specified limited overhead reaching.  The Commissioner responds that the DOT is silent as to overhead reaching, and that none of the listed occupations necessarily involve overhead reaching.  As each of the three occupations listed by the VE may involve overhead reaching, this question may be explored upon remand if further VE testimony is necessary and provided.

In sum, the ALJ failed to give sufficient weight to the opinions of Dr. Gibson and Dr. Nash, relied too heavily upon the opinions of Dr. Strahl, and the initial hypothetical presented to

the VE failed to adequately consider the entire medical record. Consequently, the Court finds that substantial evidence does not support the ALJ's conclusion. This matter must therefore be remanded for proper consideration of the evidence.

## Conclusion

For the reasons stated above, the motion for an order reversing the Commissioner's decision (ECF No. 7) is **granted**, the motion for an order affirming the decision of the commissioner (ECF No. 8) is **denied**, and this case is **remanded** to the ALJ for proceedings consistent with this Opinion and Order.

DATED at Burlington, in the District of Vermont, this 7th day of August, 2019.


/s/ William K. Sessions III
William K. Sessions III
District Court Judge